Citation Nr: 1536772 
Decision Date: 08/27/15 Archive Date: 09/04/15

DOCKET NO. 10-48 444 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Waco, Texas


THE ISSUES

1. Entitlement to service connection for tinnitus. 

2. Entitlement to service connection for bilateral hearing loss. 

3. Entitlement to service connection for posttraumatic stress disorder (PTSD). 

4. Entitlement to an increased rating for depressive reaction, currently evaluated as 10 percent disabling. 


REPRESENTATION

Appellant represented by: Texas Veterans Commission




ATTORNEY FOR THE BOARD

R. Giannecchini


INTRODUCTION

The Veteran had active military service from June 1964 to July 1970. 

This matter comes to the Board of Veterans' Appeals (Board) on appeal following a February 2010 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in Waco, Texas. 

By way of history, in a February 2014 decision, the Board denied the Veteran's claims of service connection for soft tissue sarcoma and for hypertension. It remanded the claims of service connection for tinnitus, for bilateral hearing loss, and for PTSD, as well as the claim for a higher rating for service-connected depressive reaction. In September 2014, the Board again remanded the claims. In July 2015, the RO issued a supplemental statement of the case (SSOC) and returned the Veteran's appeal to the Board for further appellate consideration. 

The issue of service connection for tinnitus is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. The weight of the competent medical evidence does not attribute the Veteran's bilateral hearing loss to his period of active military service. 

2. The weight of the competent medical evidence does not reflect that the Veteran has PTSD. 

3. From June 10, 2009 to November 17, 2009, the Veteran's depressive reaction is manifested by moderate symptoms manifested as depressed mood, loss of energy, easy tiring, increased appetite and weight, as well as broken sleep. 

4. From November 18, 2009 to January 9, 2012, the Veteran's depressive reaction is manifested by mild depressed mood with anhedonia with negative clinical screens for depression. 

5. From January 10, 2012 to April 30, 2014, the Veteran's depressive reaction is manifested by depressed mood daily, anxiety, and mild memory loss. 

6. Since May 1, 2014, the competent evidence does not reflect depressive symptoms greater than mild in degree. 


CONCLUSIONS OF LAW

1. The Veteran does not have hearing loss that is the result of disease or injury incurred in or aggravated during active military service. 38 U.S.C.A. §§ 1101, 1110, 1112(a), 1113, 1131, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.307, 3.309, 3.385 (2015). 

2. The Veteran does not have PTSD that is the result of disease or injury incurred in or aggravated during active military service. 38 U.S.C.A. §§ 1110, 1131, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.304 (2015). 

3. From June 10, 2009 to November 17, 2009, the criteria for a rating to 30 percent, and no higher, for depressive reaction are met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.126, 4.130, Diagnostic Code 9433 (2015). 

4. From November 18, 2009 to January 9, 2012, the criteria for a rating greater than 10 percent for depressive reaction are not met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.126, 4.130, Diagnostic Code 9433 (2015). 

5. From January 10, 2012 to April 30, 2014, the criteria for a rating to 30 percent, and no higher, for depressive reaction are met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.126, 4.130, Diagnostic Code 9433 (2015). 

6. Since May 1, 2014, the criteria for a rating greater than 10 percent for depressive reaction are not met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.126, 4.130, Diagnostic Code 9433 (2015). 


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Duties to Notify and Assist

The Board notes at the outset that, as a general rule, VA has an obligation to notify claimants what information or evidence is needed in order to substantiate a claim, and a duty to assist claimants by making reasonable efforts to get the evidence needed. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A and 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2015). 

The Board finds that all notification action needed has been accomplished to make a decision on the claims of service connection for bilateral hearing loss and for PTSD, as well as the claim for an increased rating for depressive reaction. 

In a July 2009 letter, the RO notified the Veteran of the information and evidence needed to substantiate his claims. The RO also notified the Veteran that VA was responsible for obtaining relevant records from any Federal agency and that VA would make reasonable efforts to obtain relevant records not held by a Federal agency, such as from a state, private treatment provider, or an employer. Additionally, the notice letter asked the Veteran to submit medical evidence, opinions, statements, and treatment records. In addition, the letter provided the Veteran with the general criteria for assigning disability ratings and effective dates. See Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006), aff'd, Hartman v. Nicholson, 483 F.3d 1311 (Fed. Cir. 2007).

There is no indication that any additional action is needed to comply with the duty to assist in connection with the claims decided herein. The Veteran's service treatment records (STRs) have been obtained as have VA and private treatment records, and the Veteran had been provided a number of VA examinations. Also, the RO notified the Veteran in October 2009 that VA medical records related to the Veteran's reported treatment at the Dallas (Texas) VA Medical Center could not be found. The Veteran was advised to submit any VA records he had in his possession. Additionally, the Veteran was advised in June 2015 that the Social Security Administration (SSA) did have any records related to him. Otherwise, the Veteran and his representative have provided argument with respect to the Veteran's claims. The Board finds that the record as it stands includes adequate competent evidence to allow the Board to decide the case and no further action is necessary. 

II. Analysis

Service Connection

Service connection may be granted for disability resulting from disease or injury incurred in or aggravated by active military service. 38 U.S.C.A. §§ 1110, 1131; 38 C.F.R. § 3.303. In this regard, the evidence must demonstrate (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; (3) and a causal relationship between the present disability and the disease or injury incurred or aggravated during service. See Shedden v. Principi, 381 F.3d 1163, 1167-67 (Fed. Cir. 2004). 

Bilateral Hearing Loss

Where a veteran served 90 days or more during a period of war or during peacetime service after December 31, 1946, and sensorineural hearing loss becomes manifest to a degree of 10 percent or more within one year from the date of termination of such service, such disease shall be presumed to have been incurred in or aggravated by service, even though there is no evidence of such disease during the period of service. This presumption is rebuttable by affirmative evidence to the contrary. 38 U.S.C.A. §§ 1101, 1112, 1113; 38 C.F.R. §§ 3.307, 3.309. 

Impaired hearing will be considered to be a disability for purposes of service connection under VA regulations when the auditory threshold in any of the frequencies of 500, 1000, 2000, 3000, and 4000 hertz (Hz) is 40 decibels (dB) or greater; or the thresholds for at least three of these frequencies are 26 dB or greater; or speech recognition scores are less than 94 percent. 38 C.F.R. § 3.385.

The Veteran has alleged that he has bilateral hearing loss that is related to his period of service. The absence of in-service evidence of hearing loss is not fatal to a claim for service connection. See Ledford v. Derwinski, 3 Vet. App. 87, 89 (1992). Evidence of a current hearing loss disability (i.e., one meeting the requirements of section 3.385, as noted above) and a medically sound basis for attributing such disability to service may serve as a basis for a grant of service connection for hearing loss. See Hensley v. Brown, 5 Vet. App. 155, 159 (1993). 

The Veteran's service personnel records document his duties as a Hawk missile crewman as well as a general vehicle repairman. He appears to have been assigned to an artillery unit during his entire active service period. 

A review of the Veteran's STRs reflects an audiogram in June 1964 during a service entrance examination. On audiological examination, puretone thresholds, in decibels, were as follows: 



500 Hertz
1000 Hertz
2000 Hertz
3000 Hertz
4000 Hertz
Right Ear
-5 dB
-5 dB
-5 dB
5 dB
20 dB
Left Ear
 5 dB
-5 dB
-5 dB
10 dB
20 dB

On audiological examination in April 1965, puretone thresholds, in decibels, were as follows: 




500 Hertz
1000 Hertz
2000 Hertz
3000 Hertz
4000 Hertz
Right Ear
 10 dB
 10 dB
 0 dB
0 dB
5 dB
Left Ear
 0 dB
 0 dB
 0 dB
5 dB
15 dB

On audiological examination in July 1968, puretone thresholds, in decibels, were as follows: 


500 Hertz
1000 Hertz
2000 Hertz
3000 Hertz
4000 Hertz
Right Ear
 5 dB
 5 dB
 5 dB
No record
55 dB
Left Ear
 5 dB
 0 dB
 0 dB
No record
30 dB

In the "Summary of Defects and Diagnoses" associated with the July 1968 report of medical examination, the Veteran was noted to have high frequency hearing loss in the right ear. 

During a separation medical examination in March 1970, on audiological examination, puretone thresholds, in decibels, were as follows: 


500 Hertz
1000 Hertz
2000 Hertz
3000 Hertz
4000 Hertz
Right Ear
 0 dB
 5 dB
 5 dB
No record
10 dB
Left Ear
 0 dB
 0 dB
 5 dB
No record
15 dB

In the "Summary of Defects and Diagnoses" associated with the March 1970 report of medical examination, there was no report or reference to high frequency hearing loss in the right ear. 

In June 2009, the Veteran filed his claim for service connection for bilateral hearing loss. 

In a November 2009 VA audiological examination, the Veteran reported exposure to military gunfire and explosions. Hearing protection was reportedly not worn. Audiological testing revealed bilateral sensorineural hearing loss that met the requirements of 38 C.F.R. § 3.385. The VA examiner (audiologist) commented that after review of the Veteran's STRs, a personal interview, and audiometric testing, an opinion regarding service connection for bilateral hearing loss would be based on speculation due to discrepancies in audiometric thresholds on enlistment and discharge audiometric evaluations. 

In a January 2010 addendum medical opinion, the VA examiner opined that the Veteran's hearing loss was less likely as note a result of noise exposure during military service. The examiner failed to provide any rationale for the opinion. 

Following the Board's February 2014 remand, the Veteran was provided an additional VA audiological examination in May 2014 which was conducted by a different VA examiner (audiologist). The VA examiner commented:

Veteran served in the US Army from [June 1967 to July 1970]. Veteran reported military noise exposure from large gunfire occasionally wearing hearing protection. Veteran reported occasional recreational noise exposure as a hunter not wearing hearing protection. 

Audiological testing demonstrated the Veteran as having bilateral sensorineural hearing loss that met the requirements of 38 C.F.R. § 3.385. Following a review of the Veteran's STRs, the examiner reported that during service there had not been a permanent positive threshold shift (worse than reference threshold) greater than normal measurement variability at any frequency between 500 and 6000 Hz for either ear. The examiner opined that the Veteran's bilateral hearing loss was not caused by or a result of an event in military service. The examiner's rational for that opinion was the following:

Veteran's claims folder was reviewed in VBMS. Entrance examination dated 6/11/64 revealed hearing within normal limits at ratable frequencies. Separation examination dated 3/1/70 revealed hearing within normal limits at ratable frequencies. No significant threshold shifts were observed during active military service. 

Following the Board's September 2014 remand, the May 2014 VA examiner provided an addendum opinion in March 2015. With respect to the July 1968 service audiogram and the 55 dB threshold at 4000 Hz, the VA examiner noted the following:

Veteran's claims folder was reviewed in VBMS. Veteran had a pure tone threshold of 55 dB at [4000] Hz in the right ear at July 1968 examination. Veteran's hearing was within normal limits at ratable frequencies at separation examination. At compensation and pension examination dated [in May 2014] veteran's hearing was 45 dB at [4000] Hz in the right ear. No significant changes in hearing were observed at ratable frequencies during active military service. 

As discussed above, the July 1968 service audiogram does reflect impaired hearing in the right ear at 4000 Hz for VA purposes. However, as noted by the May 2014 VA examiner, the subsequent March 1970 service audiogram reflects normal hearing (10 dB at 4000 Hz) in the right ear. Both VA examiners have reviewed the evidence of record and considered the Veteran's noise exposure history. Both have concluded that the Veteran's bilateral hearing loss is not related to service. The May 2014 VA examiner, who provided the March 2015 addendum opinion, has specifically taken into account and commented on the finding of impaired hearing in service (55 dB at 4000 Hz). He has provided an explanation as to why that finding is not necessarily significant. In this case, the 55 dB finding in July 1968 improved to 10 dB in the March 1970 audiogram. Thereafter, 45 dB at 4000 Hz was reported during the May 2014 VA audiogram. The Board finds the opinion of the May 2014 examiner to be persuasive, especially in light of the VA examiner's expertise. Furthermore, the Board finds the opinion is based on consideration of both lay and medical evidence, and contains not only clear conclusions with supporting data, but also a reasoned medical explanation connecting the two. See Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 301 (2008). 

The Board has weighed the Veteran's lay history against the VA opinion evidence. Although lay persons are competent to provide opinions on some medical issues, see Kahana v. Shinseki, 24 Vet. App. 428, 435 (2011), as to the specific issue in this case-whether the Veteran's hearing loss is related to his period of service falls outside the realm of common knowledge or expertise of the Veteran. See Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007); 38 C.F.R. § 3.159(a)(1) (2013). 

Furthermore, while the Board may not consider the absence of evidence as substantive negative evidence, it still may draw a reasonable inference from a lack of notation of a condition in a medical report, if the report would be expected to carry such information. Buczynski v. Shinseki, 24 Vet. App. 221, 224 (2011). The Board notes that audiograms measure hearing acuity. The audiograms administered in service do not reflect, per the VA opinions, a worsening of the Veteran's hearing from the time of entrance onto active duty to the time of separation, a fact supported by the Veteran's hearing at separation being identified as normal. While consideration has been given to the Veteran's lay testimony, the Board assigns greater probative weight to the VA examiner's March 2015 addendum opinion in light of its thoroughness and the explanation provided, as well as the competency of the examiner providing the opinion. 

The American Medical Association defines "acoustic trauma" as "[a] severe injury to the ear caused by a short-duration sound of extremely high intensity such as an explosion or gunfire." See Reeves v. Shinseki, 682 F. 3d 988, 1003 (Note 7) (Fed. Cir. 2012), citing American Medical Association Complete Medical Encyclopedia 112 (Jerrold B. Leiken, M.D., & Martin S. Lipsky, M.D., eds., 2003). An acoustic trauma can cause permanent hearing loss, but does not necessarily do so. Id. As such, the May 2014 VA examiner's finding that the Veteran's hearing loss was not related to service has support in the medical literature. 

Otherwise, there is absent from the record competent evidence linking any current hearing loss to the Veteran's period of service or within one year of service, or necessarily refuting the VA examiner's opinion. No medical professional provides findings or opinions to that effect, and neither the Veteran nor his representative has presented or alluded to the existence of any such medical evidence or opinion. 

The Board emphasizes that it does not question that the Veteran was exposed to noise during service. Nevertheless, under the circumstances-given the lack of competent medical evidence relating the Veteran's hearing loss to his active military service-the Board concludes that service connection for bilateral hearing loss is not warranted. In reaching this conclusion, the Board has considered the applicability of the benefit-of-the-doubt doctrine. However, as the preponderance of the evidence weighs against the claim, that doctrine is not helpful to the Veteran. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49, 53-56 (1990). 

Posttraumatic Stress Disorder

The Veteran filed his claim for PTSD in June 2009. His reported stressors appear related to hearing second hand about a friend who had drowned, as well as a friendly fire incident between United States Army forces while the Veteran was in Vietnam. As noted previously, the Veteran's service personnel records document his duties as a Hawk missile crewman as well as a general vehicle repairman. He appears to have been assigned to an artillery unit during his entire active service period. 

The Board notes that in order to establish service connection for PTSD, the evidence of record must include a medical diagnosis of the condition in accordance with 38 C.F.R. § 4.125(a); a link, established by medical evidence, between current symptoms and an in-service stressor; and credible supporting evidence that the claimed in-service stressor occurred. 38 C.F.R. § 3.304(f). With respect to the third element, if the evidence shows that a veteran engaged in combat and the veteran is claiming a combat-related stressor, no credible supporting evidence is required. Id.; see Doran v. Brown, 6 Vet. App. 283 (1994).

The Veteran's STRs do not reflect a diagnosis or treatment for a stress disorder such as PTSD. The Veteran was treated in service for depression and medically discharged for severe, chronic depressive reaction (psychoneurotic) manifested by insomnia, lack of concentration, poor attentiveness to detail, reduced emotionality, and suicidal ideation. The Veteran is service connected for depressive reaction (psychoneurotic). 

Otherwise, following his claim for service connection for PTSD in June 2009, the Veteran was provided a VA mental disorders examination in November 2009. In particular, when the Veteran was asked what sorts of mental and emotional problems he was having, he did not describe significant problems other than continued mild depressed mood with anhedonia. The examiner's diagnosis was dysthymic disorder. 

A June 2011 VA treatment record noted the Veteran's denial of PTSD-related issues. 

The Veteran again underwent a VA mental disorders examination in January 2012. The examiner reviewed the Veteran's medical records and cited to an August 2009 VA mental health consult which did not reflect a diagnosis of PTSD as well as referenced the November 2009 VA mental disorders examination. The examiner noted that the Veteran's current symptoms consisted of depressed mood, anxiety, and mild memory loss. The examiner concluded, "The only Axis I [mental health] disorder for which this veteran meets criteria is Alcohol Abuse in long term remission." 

On VA examination in May 2014 related to the Veteran's claim for PTSD, the Veteran reported as a distressing event that in Vietnam he had been told of the death of a good friend by another friend. The examiner did not identify any behavioral abnormalities. In particular, the Veteran's presenting mood was "good" and his affect was euthymic, stable and congruent with mood. The examiner reported that the Veteran's symptoms failed to meet the criteria for PTSD or any other mental health disorder. In an October 2014 addendum opinion, the May 2014 VA examiner again identified that the Veteran did not have a PTSD diagnosis or other mental health disorder. In particular, the examiner noted the following:

Veteran denied history of mental health problems saying he's never had issues with nightmares, mood issues, or depression. . . The Veteran's main complaints are his wife plays [video games] too much. Veteran did indicate when he gets irritated at times his wife withdraws and that bothers him. Veteran also said his main complaint in life was his granddaughter because she has interpersonal skills and has [a] negative attitude[ ] towards him that cause[s] him stress. 

Veteran denied sleep problems saying he gets 6 to 7 hours per night and feels rested when he wakes up. Veteran denied appetite problems saying he eats regularly. Veteran reported stable mood, good motivation, interacts well with peers without problems, and has no mood disturbances. 

In a January 2015 VA treatment record, a medical screening for PTSD was negative. 

A March 2015 VA examination did not identify the Veteran as having PTSD. 

In a July 2015 VA PTSD examination, the Veteran reported a stressor related to the death of his friend at Cam Ranh Bay who was reportedly caught in a riptide and drowned. The Veteran's description of the event appeared to the examiner to indicate that the Veteran was present when his friend drowned. The examiner commented that the Veteran had previously reported that he had learned about the death through another friend. Another stressor reported by the Veteran related to a friendly-fire incident between U.S. Army forces that reportedly resulted in three American soldiers being wounded. With respect to both reported stressors, the VA examiner found that the Veteran's symptoms did not meet the criteria for PTSD. 

In the present case, the Board does not find that the weight of the competent evidence supports a finding of a diagnosis of PTSD. The existence of a current disability is the cornerstone of a claim for VA disability compensation. 38 U.S.C.A. §§ 1110,1131; Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992) (the absence of proof of a present disability there can be no valid claim.). At the very least, the evidence must show that, at some point during the appeal period the Veteran has the disability for which benefits are being claimed. McClain v. Nicholson, 21 Vet. App. 319 (2007) (a claim for service connection may be granted if a diagnosis of a chronic disability was made during the pendency of the appeal, even if the most recent medical evidence suggests that the disability resolved). Here, there is no competent evidence that supports a diagnosis of PTSD at any time during the appeal period. While lay persons, such as the Veteran, are competent to provide opinions on some medical issues, see Kahana, supra, as to the specific issue in this case-whether the Veteran has a diagnosed disability, such as PTSD, and whether such disability is related to service, falls outside the realm of common knowledge or expertise of the Veteran. Jandreau, supra. 

Consequently, the Board concludes that the preponderance of the evidence is against the Veteran's claim of service connection for PTSD. In this regard, at no time since the Veteran filed his claim for service connection does the evidence support a diagnosis of PTSD. As the preponderance of the evidence is against the Veteran's claim, the benefit-of-the-doubt rule does help the Veteran and his claim of entitlement to service connection for PTSD is denied. 

Increased Rating

Disability evaluations are determined by comparing a veteran's symptoms with criteria set forth in VA's Schedule for Rating Disabilities, which are based on average impairment in earning capacity. 38 U.S.C.A. § 1155 (West 2002); 38 C.F.R. Part 4 (2013). When a question arises as to which of two ratings apply under a particular diagnostic code, the higher of the two evaluations is assigned if the disability more closely approximates the criteria for the higher rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7. After careful consideration of the evidence, any reasonable doubt remaining is resolved in favor of the veteran. 38 C.F.R. § 4.3.

A veteran's entire history is reviewed when making disability evaluations. See generally 38 C.F.R. § 4.1; Schafrath v. Derwinski, 1 Vet. App. 589 (1991). Also, staged ratings are appropriate for an increased rating claim when the factual findings show distinct time periods for which the service-connected disability exhibits symptoms that would warrant different ratings. See Hart v. Mansfield, 21 Vet. App 505, 509 (2008). 

By way of history, in a January 1974 rating decision, the RO granted service connection and assigned a 10 percent evaluation for depressive reaction (psychoneurotic). The award was effective September 6, 1973. At that time, the Veteran's depressive reaction was rated under 38 C.F.R. § 4.132, Diagnostic Code 9405 (1974) for depressive reaction. More recently, as reflected in the February 2010 rating decision on appeal, the Veteran's disability is rated under 38 C.F.R. § 4.130, Diagnostic Code 9433 for dysthymic disorder. 

Under Diagnostic Code 9433, a 10 percent rating is warranted for occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or; symptoms controlled by continuous medication. A 30 percent rating is assigned for occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment; mild memory loss (such as forgetting names, directions, recent events). A 50 percent rating is assigned when there is occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships. Id. 

A 70 percent rating under Diagnostic Code 9433 is warranted for occupational and social impairment, with deficiencies in most areas, such as work, school, family relationships, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work like setting); inability to establish and maintain effective relationships. 

Lastly, a 100 percent evaluation is warranted for total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent ability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. 38 C.F.R. § 4.130, Diagnostic Code 9433.

In rating psychiatric disabilities under 38 C.F.R. § 4.130, the United States Court of Appeals for the Federal Circuit (Federal Circuit) has held that a claimant's eligibility for a 70 percent rating requires not only the presence of certain symptoms but also that those symptoms have caused occupational and social impairment in most of the referenced areas (i.e., work, school, family relations, judgment, thinking or mood) notha claimant's symptomatology is the primary consideration. See Vazquez-Claudio v. Shinseki, 713 F.3d 112 (Fed. Cir. 2013). The Federal Circuit commented that although a claimant's symptomatology is the primary consideration, the regulation also requires an ultimate factual conclusion as to the claimant's level of impairment in "most areas." Vazquez-Claudio at 118. 
Additionally, the Federal Circuit held that a veteran may only qualify for a given disability rating under § 4.130 by demonstrating the particular symptoms associated with that percentage, or others of similar severity, frequency, and duration. Id. at 117. 

Also, when it is not possible to separate the effects of a service-connected disability from a nonservice-connected disability, such signs and symptoms shall be attributed to the service-connected disability. See Mittleider v. West, 11 Vet. App. 181, 182 (1998). The symptoms listed in VA's general rating formula for mental disorders are not intended to constitute an exhaustive list, but rather are to serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating. Mauerhan v. Principi, 16 Vet. App. 436 (2002). 

Consideration is given to the frequency, severity, and duration of psychiatric symptoms, the length of remission, and the Veteran's capacity for adjustment during periods of remission. The rating agency shall assign an evaluation based on all the evidence of record that bears on occupational and social impairment, rather than solely on the examiner's assessment of the level of disability at the moment of the examination. 38 C.F.R. § 4.126(a). Furthermore, when evaluating the level of disability from a mental disorder, the rating agency will consider the extent of social impairment, but shall not assign an evaluation solely on the basis of social impairment. 38 C.F.R. § 4.126(b). 

The Global Assessment of Functioning (GAF) scale is a scale from 0 to 100, reflecting the psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. See Diagnostic and Statistical Manual of Mental Disorders (DSM-IV); 38 C.F.R. §§ 4.125, 4.130. 

A GAF scored of 31-40 indicates some impairment in reality testing or communications or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. A GAF of 41-50 denotes serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning. A GAF of 51-60 denotes moderate symptoms (e.g. flat affect, circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). A GAF of 61-70 denotes some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. Id. 

A review of the evidence reflects VA clinical screens for depression being negative in February 2008 and May 2009. On June 10, 2009 the RO received the Veteran's claim for a higher rating for his service-connected depressive reaction. 

In an August 6, 2009 VA mental health consult note, it was reported that the Veteran managed to cope with his depressive symptoms and remain functional until he retired from his long-term job and found himself less active and with less to do. The clinician reported that the Veteran's symptoms were moderate in severity and included depressed mood, loss of energy and easy tiring, increased appetite and weight, and broken sleep. It was also noted that prior to the consult the Veteran had been relatively functional and minimally symptomatic "until the past few months." Otherwise, the clinician noted that during the interview the Veteran's mood was mildly depressed with affect that was appropriate but somewhat reduced in range, and the Veteran did not appear markedly sad. There were no other abnormalities described during the mental status evaluation. The clinician's diagnosis was dysthymic disorder. The Veteran's current GAF was reported as 60 and in the past year, 70. The Veteran was prescribed Bupropion. 

In a November 18, 2009 VA mental disorders examination, the examiner noted having reviewed the Veteran's claims folder as well as conducting a clinical interview and examination of the Veteran. The examiner noted that the Veteran had been prescribed Buspirone by his primary care physician. Otherwise, the examiner commented:

When asked what sorts of mental and emotional problems he was having, the veteran does not describe significant problems other than continued mild depressed mood with anhedonia. He does not really describe other symptoms of depression and says that the depression is not nearly as significant now as it was previously. He says that since he retired he has little to do, and this is a source of some of his current depressive issues. He said that he has average worries about bills and his current living situation. He also says that he is somewhat irritable and angry at times and does not really describe other mental health symptoms. He denies any mania or psychosis. He denies any suicidal or homicidal ideation in recent years. 

On mental status examination there were not any significant problems reported. Also, the examiner commented that there appeared to be very little change in the veteran's social and occupational functioning. The Veteran was noted to have lost touch with a number of friends and mainly interacted with his family. He had also stopped working but did not describe significant problems on the job related to his dysthymia. The examiner's diagnosis was dysthymic disorder. A GAF of 65-70 was reported. 

The Veteran again underwent a VA mental disorders examination on January 10, 2012. The examiner reviewed the Veteran's medical records and cited to the August 2009 VA mental health consult as well as the November 2009 VA examination. The examiner also cited to June 2011 and September 2011 VA clinical records which reflected negative screens for depression. Otherwise, the examiner noted that the Veteran's current symptoms consisted of depressed mood, anxiety, and mild memory loss. The Veteran rated his depression as a 7 out of 10 and also reported suffering from an anxiety/panic attack the previous month. The examiner noted the Veteran's report of depressed mood daily and that the Veteran slept 6-10 hours, was rested and had a good energy level. The examiner did not identify other mental status abnormalities. The examiner concluded that the Veteran's only Axis I disorder was alcohol abuse in long term remission. 

On VA examination on May 1, 2014 related to the Veteran's claim for PTSD, the examiner did not identify any behavioral abnormalities. In particular, the Veteran's presenting mood was "good" and his affect was euthymic, stable and congruent with mood. Associated with an October 2014 addendum opinion, the examiner identified that the Veteran did not have a PTSD diagnosis or other mental health disorder. In particular, the examiner noted the following:

Veteran denied history of mental health problems saying he's never had issues with nightmares, mood issues, or depression. He further denied history of psychiatric medications. The Veteran's main complaints are his wife plays [video games] too much. Veteran did indicate when he gets irritated at times his wife withdraws and that bothers him. Veteran also said his main complaint in life was his granddaughter because she has interpersonal skills and has [a] negative attitude[ ] towards him that cause[s] him stress. 

Veteran denied sleep problems saying he gets 6 to 7 hours per night and feels rested when he wakes up. Veteran denied appetite problems saying he eats regularly. Veteran reported stable mood, good motivation, interacts well with peers without problems, and has no mood disturbances. 

In a March 2015 VA examination, the May 2014 VA examiner commented that the Veteran did not have PTSD or any other mental health disorder. 

In a July 2015 VA examination, the Veteran's mood was noted as pretty good and his affect was mood congruent. The examiner commented that when asked about symptoms of depression, the Veteran denied all symptoms except a decreased interest in activities and stated "I get sad one or two days per week. I sleep 6-7 hours sometimes more. Sure I can focus during the day and I have energy during the day as long as I'm not outside in the heat." The examiner added that one symptom of depression does not equate to a diagnosis of depression or dysthymia. 

In light of the August 6, 2009 VA mental health consult note and finding reasonable doubt in the Veteran's favor, the Board finds that from June 10, 2009 to November 17, 2009, a 30 percent rating is warranted for the Veteran's depressive reaction. A 30 percent rating is assigned for occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as depressed mood, anxiety, and sleep impairment. 

Here, the Board finds persuasive the VA clinician's findings noted in the August 2009 VA mental health note identify moderate symptoms and a GAF of 60. 
The Board does not otherwise find a rating greater than 30 percent is warranted during the period June 10, 2009 to November 17, 2009. As noted above, the only evidence which demonstrates a worsening of the Veteran's symptomatology during this period is the August 6, 2009 VA mental health note. That mental health note does not reflect evidence consistent with occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; or impaired abstract thinking. While the VA clinician did note that the Veteran suffered from depressed mood, at the time of the August 2009 evaluation the Veteran was identified as mildly depressed and did not appear markedly sad. As such, the Board finds the medical evidence from June 10, 2009 to November 17, 2009 is best encompassed by the 30 percent rating based on the criteria which include depressed mood, anxiety, and panic attacks (weekly or less often), as well as generally functioning satisfactorily, with routine behavior, self-care, and conversation normal. 

Additionally, the Board does not find during this period of the appeal that the Veteran's disability picture reflects occupational and social impairment, with deficiencies in most areas, such as work, school, family relationships, judgment, thinking, or mood; or that the Veteran's depressive reaction resulted in total social and occupational impairment. 

For the period November 18, 2009 to January 9, 2012, the Board finds the Veteran's depressive reaction warrants no higher than a 10 percent rating. As reported previously, in the November 18, 2009 VA examination the examiner noted that the veteran did not describe significant problems other than continued mild depressed mood with anhedonia, and that his retirement was the source of some of his current depressive issues. Furthermore, the examiner commented that the Veteran had not described significant problems on the job when he had been working related to his dysthymia. A GAF of 65-70 was reported reflective of mild symptoms. Otherwise, from the November 18, 2009 VA examination to January 9, 2012, the evidence of record does not demonstrate any other significant clinical findings that would warrant a rating greater than 10 percent. The Board finds persuasive that June 2011 and September 2011 VA clinical records reflect negative screens for depression. 
As such, the Board finds the medical evidence from the November 18, 2009 VA examination demonstrate or more nearly approximate occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or; symptoms controlled by continuous medication. 

From January 10, 2012 to April 30, 2014, again finding reasonable doubt in favor of the Veteran and in light of the January 10, 2012 VA examination findings, the Veteran's depressive reaction warrants a rating to 30 percent. The Board finds persuasive that the examiner noted that the Veteran's current symptoms consisted of depressed mood, anxiety, and mild memory loss. The Veteran rated his depression as a 7 (out of 10) and also reported suffering from an anxiety/panic attack the previous month. As such, the Board finds the Veteran's disability picture during this period more nearly approximates depressed mood, anxiety, and panic attacks (weekly or less often), but generally functioning satisfactorily, with routine behavior, self-care, and conversation normal. As such, a 30 percent rating is warranted. The Board is mindful in this instance that the examiner concluded that the Veteran's only Axis I disorder was alcohol abuse in long term remission. A depressive disorder and/or dysthymia was not found. Nonetheless, the Veteran is service-connected for depressive reaction and the examiner identified psychiatric symptomatology which the Board will accept as being related to the service-connected depressive reaction. See e.g. Mittleider and Mauerhan, supra. 

The Board does not otherwise find a rating greater than 30 percent is warranted from January 10, 2012 to April 30, 2014. Of note, the only evidence which demonstrates a worsening of the Veteran's symptomatology during this period is the January 10, 2012 VA examination. As discussed above, the Board has found this evidence more nearly approximates a rating of 30 percent. However, the evidence does not otherwise demonstrate or more nearly approximate occupational and social impairment with reduced reliability and productivity due to such symptoms as flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; or impaired abstract thinking. Additionally, the Board does not find the Veteran's disability picture during this period reflects occupational and social impairment with deficiencies in most areas, such as work, school, family relationships, judgment, or thinking, or that the Veteran's depressive reaction resulted in total social and occupational impairment. 

For the period on and after May 1, 2014, the Board finds the Veteran's depressive reaction warrants no higher than a 10 percent rating. 

Here, as reported above, on VA examination in May 2014, the Veteran's presenting mood was "good" and his affect was euthymic, stable and congruent with mood. Associated with an October 2014 addendum opinion, the May 2014 VA examiner noted that the Veteran denied a history of mental health problems saying he had never had issues with nightmares, mood issues, or depression. While the Veteran's report appears to be in conflict with his previous reported history during other examinations, the Board has no choice but to accept it as being true. Otherwise, the Veteran denied sleep problems and reported a stable mood, good motivation, good interaction with his peers, and that there were no mood disturbances. In a July 2015 VA examination, conducted by a different VA examiner, the Veteran's mood was noted as pretty good and his affect was mood congruent. The examiner commented:

When asked about symptoms of depression the veteran denied all symptoms except a decreased interest in activities and stated "I get sad one or two days per week. I sleep 6-7 hours sometimes more. Sure I can focus during the day and I have energy during the day as long as I'm not outside in the heat." One symptom of depression does not equate to a diagnosis of depression or dysthymia. 

In the present case, the Board does not find that the medical evidence, which includes the Veteran's subjective reports about his psychiatric symptomology, reveals the Veteran to have any current symptoms related to his service-connected depressive reaction. In light of this fact, a rating greater than 10 percent for depressive reaction since May 1, 2014 is not warranted. (Parenthetically, the Board notes that the Veteran's 10 percent rating for depressive reaction is protected under 38 C.F.R. § 3.951 (2015).) 

The above determination is based upon consideration of applicable rating provisions. The Board also has considered whether the Veteran is entitled to a greater level of compensation on an extra-schedular basis. Ordinarily, the VA Schedule will apply unless there are exceptional or unusual factors, which would render application of the schedule impractical. An exceptional or unusual disability picture occurs where the diagnostic criteria do not reasonably describe or contemplate the severity and symptomatology of a veteran's service-connected disability. Thun v. Peake, 22 Vet. App. 111, 115 (2008). If an exceptional or unusual disability picture is found, the RO would then refer the claim to the Chief Benefits Director or the Director, Compensation Service, for consideration of an extra-schedular evaluation. 38 C.F.R. § 3.321(b)(1). 

The Board also notes that Federal Circuit has held that 38 C.F.R. § 3.321 requires consideration of whether a Veteran is entitled to referral to the Director, Compensation Service, for consideration of the assignment of an extra-schedular rating based on the combined effect of his or her service-connected disabilities, individually or in combination. See Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014). The Board has a duty to consider the aggregate effects of all service-connected disabilities, even those not in appellate status, before determining whether referral for an extra-schedular rating is warranted. Id. See also Eason v. McDonald, U.S. Vet. App. No. 14-0413 (May 12, 2015). While the Board recognizes that a single-judge decision, such as Eason, carries no precedential weight, such a decision may be relied upon for any persuasiveness or reasoning it contains. See Bethea v. Derwinski, 2 Vet. App. 252, 254 (1992). 

Besides his service-connected depressive reaction, the Veteran's service-connected disabilities consist of diabetes mellitus (type II), evaluated at 20 percent; neuropathy of the right upper extremity, evaluated at 10 percent; neuropathy of the left upper extremity, evaluated at 10 percent; neuropathy of the right lower extremity, evaluated at 10 percent; and neuropathy of the left lower extremity, evaluated at 10 percent. 

In the present instance, the Board finds that the rating criteria under 38 C.F.R. § 4.130, Diagnostic Code 9433 (depressive reaction); 38 C.F.R. § 4.119, Diagnostic Code 7913 (diabetes mellitus); and 38 C.F.R. § 4.124a, Diagnostic Code 8512 (neuropathy) contemplate the Veteran's reported symptoms associated with these disabilities. 

Thus, the first step of the Thun analysis, whether the rating criteria adequately address all of the claimant's symptomatology associated with his service-connected disabilities, has been met. As such, the Board's extra-schedular analysis ends, and consideration of the second step-whether the claimant's exceptional disability picture exhibits other related factors, such as marked interference with employment or frequent periods of hospitalization-is not warranted. Therefore, without sufficient evidence reflecting that the Veteran's disability picture related to his above identified service-connected disabilities is not contemplated by the rating schedule, referral for a determination of whether the Veteran's aggregate disability picture requires the assignment of an extra-schedular rating is not warranted. 38 C.F.R. § 3.321(b)(1); Thun, supra.

In sum, based on the evidence and analysis above, the Board finds with respect to evaluations of the Veteran's depressive reaction, that a rating of 30 percent from June 10, 2009 to November 17, 2009 is warranted; a rating of 10 percent from November 18, 2009 to January 9, 2012 is warranted; a rating of 30 percent from January 10, 2012 to April 30, 2014 is warranted; and a rating of 10 percent from May 1, 2014 is warranted. See O'Connell v. Nicholson, 21 Vet. App. 89, 93 (2007) (in a staged rating context the provisions of 38 C.F.R. § 3.105(e) (requiring a proposed reduction and 60 days predetermination notice) are not applicable). 

In reaching the above conclusions, the Board has considered the applicability of the benefit-of-the-doubt doctrine. However, as the preponderance of the evidence weighs against the claim for any higher evaluations than those found warranted during the appeal period, that doctrine is not helpful to the Veteran. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49, 53-56 (1990). 


ORDER

Service connection for bilateral hearing loss is denied. 

Service connection for PTSD is denied. 

From June 10, 2009 to November 17, 2009 a rating of 30 percent for depressive reaction is granted, subject to the laws and regulations governing the payment of monetary benefits. 

From November 18, 2009 to January 9, 2012 a rating greater than 10 percent for depressive reaction is denied. 

From January 10, 2012 to April 30, 2014 a rating of 30 percent for depressive reaction is granted, subject to the laws and regulations governing the payment of monetary benefits. 

Since May 1, 2014 a rating greater than 10 percent for depressive reaction is denied. 


REMAND

In a March 2015 VA addendum opinion, a VA examiner (audiologist) noted the Veteran's report of occasional bilateral buzzing tinnitus that started in 1969. The examiner ultimately concluded that it was less likely than not that the Veteran's tinnitus was caused by military noise exposure. As rationale, the examiner commented:

As stated above after veteran's claims folder was reviewed in VBMS[,] no significant threshold shifts were ob[s]erved during active military service between [June 1967] and [July 1970]. Claims folder was negative for reported tinnitus. 

In reviewing the Veteran's electronic claims folder, medical evidence does not support that the Veteran's reported tinnitus is related to his period of active service. The above noted opinion would appear to reflect consideration by the examiner of the Veteran's medical history and the evidence of record. As such, on its face, the medical opinion appears sufficient. However, the Court has held that an examiner's failure, in rendering an opinion, to consider a claimant's lay statements as to in-service injury was impermissible. See Dalton v. Nicholson, 21 Vet.App. 23, 39 (2007). Additionally, the Court has held that a VA medical opinion is insufficient when it relies on the absence of contemporaneous medical evidence and otherwise fails to consider whether statements presented by a claimant are sufficient evidence of the etiology of the claimant's disability to prove the claim. Buchanan v. Nicholson, 451 F.3d 1331, 1337 (Fed. Cir. 2006) . 

In light of the subjective nature of tinnitus, the Veteran is deemed competent to report that he has suffered from ringing in his ears since his release from active service. The examiner appears, in part, to find that the Veteran's tinnitus in not related to service based on the lack of contemporaneous medical evidence (i.e. no post-service reports in treatment records) and the lack of significant threshold shifts on audiology testing in service. Without finding fault with the RO, it would be helpful to the Board if an addendum medical opinion was provided regarding the Veteran's claim. The opinion should comment on why the lack of significant threshold shifts on audiology testing in service is more significant or more probative, as compared to the Veteran's lay statements of experiencing tinnitus since service. 

Accordingly, the case is REMANDED for the following action:

1. Request that the Veteran identify any private or VA treatment he may have received for his tinnitus. After obtaining the appropriate release of information forms where necessary, procure records of any treatment the Veteran has received, to include relevant records available through the CAPRI records system dated since January 2015. 

If any records identified by the Veteran are not available, he should be notified of this fact in accordance with the provisions of 38 C.F.R. § 3.159(c)(2), (e)(1). 

2. After completion of the above (and allowing a reasonable amount of time to obtain any identified records), the VBMS claims folder should be referred back to the VA examiner who provided the March 2015 VA medical opinion concerning the etiology of the Veteran's tinnitus. A copy of this remand must be made available to the examiner for review in connection with the requested opinion. 

In his March 2015 opinion, the examiner commented: "As stated above after veteran's claims folder was reviewed in VBMS[,] no significant threshold shifts were ob[s]erved during active military service between [June 1967] and [July 1970]. Claims folder was negative for reported tinnitus." 

The examiner is asked to again review his March 2015 examination report along with the other evidence of record. It would be helpful to the Board if the VA examiner explained why the lack of significant threshold shift on audiology testing during active service (June 1964 to July 1970) is more significant or more probative as compared to the Veteran's statement of experiencing tinnitus since service. Said another way, does the lack of a significant threshold shift on audiological testing preclude a person from developing tinnitus or make it less likely? If so, why. 

A full explanation for all opinions expressed by the examiner must be provided. If an opinion cannot be provided without resorting to speculation, it must be noted in the examination report and an explanation provided for that conclusion. 

If the VA examiner (audiologist) who provided the March 2015 opinion concerning the etiology of the Veteran's tinnitus is not available to provide an addendum, make arrangements for the Veteran to be re-examined and the new examiner should be asked to review the electronic record, to include the report of March 2015 VA audiology examination and provide answers to the above noted questions. 

3. After the above has been completed, undertake any additional evidentiary development deemed appropriate. Thereafter, re-adjudicate the claim of service connection for tinnitus on appeal. If any benefit sought is denied, the Veteran and his representative must be provided a supplemental statement of the case (SSOC) and given an opportunity to respond before the case is returned to the Board for appellate review. 

The Veteran has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999). 

This claim must be afforded expeditious treatment. The law requires that all claims remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).



______________________________________________
J. A. MARKEY
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs